846 So.2d 405 (2003)
George James TREPAL, Appellant,
v.
STATE of Florida, Appellee.
George James Trepal, Petitioner,
v.
James V. Crosby, Jr., Respondent.
Nos. SC89710, SC01-2267.
Supreme Court of Florida.
March 6, 2003.
Rehearing Denied May 15, 2003.
*406 Neal Andre Dupree, Capital Collateral Regional Counsel-South, Fort Lauderdale, and Tod G. Scher, Special Assistant CCRC-South, Miami, for Appellant/Petitioner.
*407 Charles J. Crist, Jr., Attorney General, and Carol M. Dittmar, Assistant Attorney General, Tampa, for Appellee/Respondent.
SHAW, Senior Justice.
George James Trepal appeals two orders of the circuit court denying his first and second motions for postconviction relief under Florida Rule of Criminal Procedure 3.850 following evidentiary hearings on both motions. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. We affirm. Trepal also has filed in this Court a petition for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(9), Fla. Const. We deny the petition.

I. FACTS
The facts of the underlying crime are set forth fully in this Court's opinion on direct appeal, which provides as follows in relevant part:
Trepal was convicted of the first-degree murder of Peggy Carr. Trepal also was convicted of six counts of attempted first-degree murder (other members of the Carr household), seven counts of poisoning food or water, and one count of tampering with a consumer product (Coca-Cola)....
....
We find the evidence sufficient to support a verdict of premeditated murder. There is substantial, competent evidence that prior to the death of Peggy Carr, the Carrs and Trepals, neighbors in Alturas, Florida, had had numerous altercations. Trepal once threatened one of the Carr children by saying, "I'm going to kill you." Shortly before Peggy Carr, her son, Duane, and her stepson, Travis, were hospitalized for thallium poisoning in October 1988, the Carrs received a note threatening: "two weeks to move out of Florida forever or else you will all die." Thallium-laced Coca-Colas were found in the Carr household, after weeks of searching, by state and federal environmental agencies. (The Carrs had vacated the house during the week of the hospitalizations and never had moved back.) When their next-door neighbor, Trepal, was asked why anyone would want to poison the family, he said, "to get them to move out, like they did."
Trepal had researched and written a pamphlet about voodoo for a Mensa murder weekend, which read, in part:
Few voodooists believe they can be killed by psychic means, but no one doubts that he can be poisoned. When a death threat appears on the doorstep, prudent people throw out all their food and watch what they eat. Hardly anyone dies from magic. Most items on the doorstep are just a neighbor's way of saying, "I don't like you. Move or else!"
The themes (move or else) in the threatening note and in the voodoo pamphlet were similar.
Trepal told Goreck, an undercover agent, that the poisonings were "just a personal vendetta." Contrary to Trepal's assertion that he went to his wife's office every day, in fact he stayed at home or went to his own office each day. There was a window of time when the Carr household was unoccupied and it was undisputed that Trepal was able to surveil the household. There was testimony that the Carr house often was left unlocked. The Trepals and Carrs shared a water supply; Trepal's presence on the Carr property thus would not have been unusual.
The evidence at trial showed that Trepal is extremely intelligent, and has a highly developed knowledge of chemistry. Evidence also was presented that thallium is a by-product of amphetamine production and Trepal was the chemist *408 for an amphetamine laboratory in the 1970s. Thallium is a poison so toxic that it has been banned by the Food and Drug Administration since 1982. Because of its toxicity, its sale and distribution are controlled and recorded, and it is not available to the general public, but only to universities and research centers. A bottle of thallium was found in Trepal's garage in Alturas. A hand-assembled journal, bearing Trepal's prints and containing information on poisons, including thallium, and data on the autopsy detection of poisons, was found in Trepal's Sebring home. A great many chemicals were found there, along with chemical equipment. The Agatha Christie novel, Pale Horse, dealing with murder by introducing thallium into a household, also was found there.
Evidence was presented that of the chemical forms of thallium that exist, only one form can be introduced into Coca-Cola without producing noticeable changes in the drink. Evidence was presented that the bottle caps had been pried off the Coca-Cola bottles. Evidence was introduced that worldwide, Coca-Cola found no other incidences of tampering with the product, and received no ransom note after the poisoning. Evidence also was presented that a bottle-capping machine was seen among the items in the Trepals' garage when they moved into their Alturas home.
Trepal v. State, 621 So.2d 1361, 1363-65 (Fla.1993) (footnotes omitted).
The jury recommended death by a nine-to-three vote, and the judge imposed a sentence of death based on three aggravating circumstances,[1] one statutory mitigating circumstance,[2] and several nonstatutory mitigating circumstances.[3] Trepal raised seven issues on appeal.[4] We affirmed. On June 16, 1995, Trepal filed in *409 circuit court an initial rule 3.850 motion and on March 21, 1996, an amended motion,[5] raising thirty claims.[6] The circuit court on October 7-11, 1996, conducted an evidentiary hearing on several claims and denied relief. Trepal appealed and, while the appeal was pending in this Court, the Office of the Inspector General of the United States Department of Justice ("OIG") issued a report on April 15, 1997, that was highly critical of the work performed by the FBI Crime Laboratory in Washington, D.C., in certain cases, including the present case.[7]
This Court consequently remanded this case to the circuit court to give Trepal an opportunity to peruse the OIG report and file a second rule 3.850 motion. Trepal on September 1, 1998, filed a second amended rule 3.850 motion, raising twenty-one claims relating to tests conducted at the FBI Crime Laboratory.[8] The circuit court *410 held a bifurcated evidentiary hearing in 1999,[9] and denied relief. Trepal appeals, raising six claims[10] relating to issues raised in both his first and second rule 3.850 motions. Trepal also has filed in this Court a petition for a writ of habeas corpus, raising two claims.[11]

II. RULE 3.850 MOTIONS
As noted above, Trepal raises six claims in his present appeal of the circuit court's orders denying rule 3.850 relief. The claims relate to both his first and second rule 3.850 motions and contain numerous subclaims. The bulk of Trepal's postconviction appellate argument focuses on the first claim: no adversarial testing of the issues in the guilt phase of the trial. This claim is divided into three subclaims: (a) false and inadmissible scientific testimony, (b) ineffectiveness of trial counsel, and (c) other exculpatory evidence. Most of his argument on this claim focuses on the first subclaim, which concerns improprieties in the testing procedures at the FBI lab. This subclaim was the focus of the second evidentiary hearing and is the heart of his present appeal. Accordingly, we discuss this subclaim at length.
While the first subclaim pertains exclusively to Trepal's second rule 3.850 motion, the second and third subclaims pertain to his first rule 3.850 motion and were addressed at the first evidentiary hearing. We also discuss these latter two subclaims. Finally, we discuss Trepal's fifth claim (ineffectiveness of penalty phase counsel), which also pertains to his first rule 3.850 motion and was addressed at length at the first evidentiary hearing.

III. SUBCLAIM (a): FALSE SCIENTIFIC TESTIMONY
In his first subclaim, Trepal asserts that the trial testimony of FBI specialist Roger Martz was false and inadmissible, that his testimony impermissibly tainted the trial, and that he (Trepal) thus is entitled to a new trial. This subclaim was the focus of the second evidentiary hearing below and the parties presented extensive testimony on this issue.

*411 A. Factual History

The circuit court, in its order denying relief, summarized the factual history of the case relating to this subclaim:
In late October 1988, Peggy Carr, her son, and stepson became seriously ill and were hospitalized. Peggy Carr later died. Doctors determined that she had died of thallium poisoning. Evidence taken from the victims' home included five empty 16 ounce glass Coca-Cola bottles and three full bottles. The empty bottles were sent to the Florida Department of Health and Rehabilitative Services Lab in Jacksonville. The lab determined that thallium was present; it did not attempt to determine the type of thallium.
In December 1988, the FBI received three unopened Coca-Cola bottles recovered from the victims' residence and examined them to determine whether they contained thallium. In the same month, the Coca-Cola Company began testing samples of unadulterated Coca-Cola with various forms of thallium to determine what types of thallium could have been added without altering the taste or appearance of the beverage. Frederick Reese, an analyst for the Coca-Cola Company, tested for thallium phosphate, thallium formate, thallium malonate, thallium sulfate, thallium I nitrate, and thallium III nitrate. Reese discovered that both thallium sulfate and thallium I nitrate dissolve in Coke without changing its appearance or foaming out of the bottle. The Coca-Cola Company provided its test results to the Polk County Sheriff's Office and the FBI.
Donald Havekost, a special agent in the Elemental Analysis Unit of the FBI Laboratory, examined the residue samples taken from the empty bottles along with the three full Coke bottles taken from the Carr home. FBI lab personnel labeled the full bottles Q1, Q2, and Q3. By means of a procedure known as Inductively Coupled Plasma Atomic Emission Spectrometry, Havekost established that the residue samples and Q1, Q2, and Q3 contained thallium. Havekost passed along Q1, Q2, and Q3 to Roger Martz, a Special Agent in the Materials and Analysis Unit, with a note indicating that thallium had been identified and requesting additional testing to determine what ion was associated with the thallium compound.
In December 1989, investigators recovered a small glass bottle containing a whitish powder from Trepal's garage. Investigators sent the bottle to the FBI lab for analysis. FBI lab personnel labeled the bottle Q206, and Havekost conducted testing to determine its contents. Havekost concluded that the powder contained a thallium ion. Further testing established the presence of an oxidizing ion consistent with the presence of nitrate. Testing on the Q206 sample is not in serious dispute.
In 1994, the Office of the Inspector General of the United States Department of Justice (OIG) began an investigation into laboratory practices at the FBI Crime Lab in Washington, D.C. The FBI also conducted an internal investigation into its lab practices. Part of both investigations focused on Martz's work in the Trepal case. Martz's work on Q1, Q2, and Q3 was the focal point of the evidentiary hearing.
After summarizing the factual history relating to this subclaim, the circuit court addressed the testimony that was adduced at the second evidentiary hearing, virtually all of which related to this subclaim.

B. Testimony

The circuit court summarized the testimony of the various witnesses who testified *412 at the second evidentiary hearing as follows:
At the evidentiary hearing, Trepal presented testimony regarding testing procedures used on Q1, Q2, and Q3, and whether there was any chemical connection between Q1, Q2, and Q3, and Q206. The identification of the substance in these items is important as it relates to Q206. Q206, found in Trepal's garage, contained a whitish powder identified as thallium nitrate. The prosecution never directly claimed that the thallium used in the poisoning came from Q206; however, if the three samples had been a form of thallium different from Q206, this would have been clearly favorable to the defense. Testifying at the evidentiary hearing were Roger Martz, Thomas Jourdan, Steven G. Burmeister, and James Cadigan, Special Agents with the FBI Crime Lab; Frederick Whitehurst and Donald Havekost, former FBI Special Agents; and Marland D. Dulaney, a forensic toxicologist.
A. ROGER MARTZ
Martz was Unit Chief in the Chemistry and Toxicology Unit at the FBI Laboratory. At the time of the hearing, the FBI had placed Martz on a temporary security assignment for two years pending the outcome of the internal FBI investigation into its laboratory practices. To facilitate review, the court will summarize both Martz's trial testimony and his testimony from the evidentiary hearing. At trial, Martz testified as a prosecution witness and offered testimony regarding the testing and analysis of Q1, Q2, and Q3. The following excerpt of the trial is direct examination of Martz.
Q: So you were asked when you were given those Coca-Cola samples to figure out what form of thallium was in those Coca-Colas?
A: That's correct.
Q: What did you do in order to answer that question Agent Martz?
A: Thallium commonly exists in several different salt forms. So I did some chemical tests to try and determine which salt form of thallium existed in the Coca-Cola bottles.
Q: What kind of chemical tests did you do to make that determination?
A: When I did a test called diphenylamine I got a blue color....
Q: Okay. Now, is diphenylamine a machine? Is it a substance? Tell the jury what it is.
A: It's a chemical which is mixed with sulfuric acid. And when you pour that into a solution which contains a nitrate you get a blue color.
Q: Did you do that test with regard to each of the three Coca-Cola samples?
A: Yes, I did.
Q: Did you reach a conclusion based on that test?
A: Yes, I did.
Q: And what was your opinion based on that test?
A: Based on that test I concluded that thallium nitrate was added to the Coca-Cola.
Q: Now, did you have some samples of Coca-Cola, unadulterated control samples that had been submitted to the lab?
A: Yes, I did.
Q: Did you test any of those samples with diphenylamine to ensure that Coca-Cola itself did not react with a blue color?
A: Yes, I did.
Q: And what was the result of that test?
A: No nitrates were present in the unadulterated Coca-Cola.

*413 Q: Were you able to do any tests to ensure that a sulfate or some other salt did not react in a blue color?
A: Yes, I did. Sulfate will not react with a blue color, but it will react with other chemicals which I did do on the Coca-Cola.
Q: And did you have any positive tests indicating that thallium sulfate might be present in the Coca-Cola?
A: No. I did not.
Q: Now, did you do any other tests in order to determine whether there was thallium nitrate in there, or was that the only test with regard to that?
A: I did one other test called ion chromatography.
....
A: Which is used to separate out ions. It's a separation technique in the form of liquid chromatography which is using a liquid passing through a solid to separate out different ions. The different ions will come out at different times. In this particular case, when I tested the Coca-Cola the results were positive for the nitrate ion.
Q: Now, is that a test which is just done with wet chemistry, or does that utilize some form of equipment?
A: It uses equipment. You pass the liquid through a solid phase and then you have a detector and recorder which gives the response.
Q: Did you test each of the samples on the ion chromatograph to determine whether nitrate was present?
A: Yes, I did.
Q: And what, if any, conclusion did you reach with that test?
A: On three samples that I tested, all three contained nitrate ions.
Q: Based on those two tests, is it your opinion that what was in those three Coca-Colas, sir, was thallium nitrate?
A: That is correct.
Q: Was there any way in those tests for you to determine whether that was Thallium I Nitrate or Thallium III Nitrate?
A: No, there was not.
Q: Just generally, why is that? Why can't you tell?
A: The nitrate, the Thallium I versus the Thallium III, you have three nitrates versus one nitrate. They will both respond the same to the test because they both contain nitrates. One will contain more nitrate than the other....
Q: In your testing of those three bottles, did you ever attempt any quantitative analysis about how much thallium was in there, or did you just do the nitrate analysis?
A: I just did the nitrate analysis. I made no attempt to quantitate it.
(T.T. 3556-3560)
The prosecution then questioned Martz regarding the tests performed on Q206 and how he identified the substance as thallium I nitrate.
Q: I want to show you next, sir, what has been marked as State's Exhibit No. 215. Do you recognize what this is, sir?
A: Yes, I do.
Q: What is it?
A: It's a bottle that I received in the laboratory in July 1990.
Q: What, if any, analysis were you requested to do on that bottle or the contents of that bottle at the FBI lab?
A: Inside the brown bottle is some white powder. I was asked to identify the white powder....

*414 Q: Did you test the material in that bottle to make a determination what it was?
A: Yes, I did.
Q: What type of test or analysis did you do in order to identify the substance on that bottle?
A: I used two techniques. I used x-ray diffraction and also infrared.
Q: Now, would you explain to the jury what x-ray diffraction is, sir?
A: X-ray diffraction uses x-rays which you bombard a sample with, and you change the angle of bombardment. And depending on the crystalline structure of the sample, you will get different x-rays diffracted from the sample, which will help you identify that particular sample.
Q: In doing the x-ray diffraction test of the substance in the bottle, were you able to determine what was in that bottle?
A: Yes, I was.
Q: What was it?
A: The substance I identified was thallium I nitrate.
Q: How do you determine with that test, or what makes you able to determine with that test that it is Thallium I Nitrate as opposed to Thallium III Nitrate?
A: Thallium I and Thallium III Nitrate have different crystalline structures, and the x-ray equipment is able to differentiate those particular two compounds.
Q: Did you measure the amounts quantitatively of substance found in that bottle?
A: No, I did not. But based on the testing that I did, nothing else was identified.
(T.T. 3561-2)
At the February 1999 evidentiary hearing, Martz testified exhaustively regarding the testing of QI, Q2, Q3 and Q206. His goal was to identify the ion associated with thallium. The testimony of Martz and other scientists established that Martz failed to label tests correctly, and to properly document results. (T. 66, 89, 97, 100-1, 103-5, 106, 109-11, 119-20, 132, 134, 136, 142, 160-2, and 176). The tests performed by FBI Crime Lab chemists and scientists on Q1, Q2, and Q3 include Barium Chloride, Silver Nitrate, Diphenylamine (DP), Ion Chromatography (IC), X-ray Diffraction (XRD), Scanning Electron Microscopy (SEW), and Mass Spectrometry (MS). Martz did not reveal the results of the last three tests to the jury, and he misrepresented the results of the DP and IC tests. Martz also testified falsely at trial concerning specific tests performed on Q3. Martz testified that the only tests of value in identifying the ion were the DP test and the IC test. No real attack has been made on the findings of Q206, so the discussion of testing on that item is limited to its relationship to Q1, Q2, and Q3. Martz did a series of presumptive tests on Q1, Q2, and Q3: DP, Barium Chloride, and Silver Nitrate. (T. 86-8) Presumptive tests can rule out the presence of certain substances, but they do not establish proof of the presence of a substance. A positive result on a presumptive test permits one to say that the result is consistent with the presence of the substance. (T. 92) Martz's notes indicated that the results for Q1, Q2, and Q3, and unadulterated Coca-Cola were the same. (T. 88) The fact that the results were the same on the unadulterated Coke and the Q samples suggests that those substances were not present. While testifying at the hearing, he recalled that the results on the barium chloride tests were negative for *415 both unadulterated Coke and Q1, Q2, and Q3, and that the silver nitrate test was positive for both the unadulterated Coke and Q1, Q2, and Q3. (T. 91) Conversely, he told an OIG investigator that he could not recall the results except that they were the same for all. (T. 90)
Martz tested Q1, Q2, and Q3 for the presence of an oxidizing ion with the DP test. (T. 731) The DP test consists of a chemical reagent that produces a blue color signaling the presence of an oxidizing ion. (T. 73, 92, 279) The DP test is a presumptive test like the spot tests. (T. 73) Q1, Q2, and Q3 gave positive results on the DP test. (T. at 93). Based on the spot tests and the DP test results, Martz concluded that Q1, Q2, and Q3 were chemically the same. (T. 100) The DP test was negative in unadulterated Coca-Cola, an indication that there were no nitrates present in unadulterated Coca-Cola. (T. 146-8)
The ion chromatography (IC) test is another presumptive test which detects the presence of ions. (T. 150) At the hearing Martz explained that, like the DP test, a positive result for nitrates on the IC test means that the retention time is "consistent with" the presence of nitrates. (T. 150) It does not establish conclusively that nitrates are in fact present. Positive results on both tests lead to a stronger conclusion than either single test standing alone. (T. 151) The court questioned him directly on his reasoning that the IC test and the DP test establish the presence of nitrate. Martz explained that forensic scientists customarily rely on a combination of tests to establish the presence of a substance, (T. 152), and that only nitrate will give positive results on both tests. (T. 155)
Martz discussed the testing he performed on Q3. (T. 100, 160) During the trial, he told the jury that he had tested all three Q samples, and that, in his opinion, all three contained nitrate ions. (T.T. 35589) At the hearing, Martz admitted that he had not performed the IC test on Q3, and that his conclusion that Q3 contained nitrate was not supported by scientific data. (T. 176) He conceded that he had failed to test Q3, and that his failure was deliberate. (T. 100, 162) The court notes that Martz's trial testimony regarding Q3 testing was not an omission or an oversight.
Martz also tested samples of unadulterated Coke for the presence of ions with the IC test. (T. 143) Two IC runs on unadulterated Coca-Cola produced a peak with a retention time similar to the retention time for nitrate. (T. 148-9) Martz explained that the result was consistent with the presence of nitrate in unadulterated Coca-Cola, but was not actually nitrate. (T. 145) He explained that a peak consistent with nitrate on the IC test and a positive DP test would establish the presence of nitrate ion in unadulterated Coke. However, an attempt to confirm the presence of nitrate in unadulterated Coca Cola using the DP test produced no blue color. (T. 145) He admitted that he did not know what was causing a peak in the unadulterated Coke runs, but that he could not conclude that it was nitrate without confirmation on the DP test. (T. 201-2) The jury never learned of the unconfirmed nitrate result.
During the remaining tests, Martz examined only Q1. Results from XRD, SEK and MS failed to confirm the presence of thallium sulfate or thallium chloride. (T. 120-1, 131-2, 134-8) He defended his methodology by postulating that Q1 is a representative sample of Q1, Q2, and Q3; therefore, results for Q1 may be extrapolated for Q2 and Q3. (T. 100, 162) At the hearing, he admitted that he erred in failing to disclose exactly *416 how he reached his conclusion, but he defended his methodology. (T. 101)
Trepal claims that Martz misled the jury with trial testimony which contradicted his dictation. In his dictation he concludes that the results of IC and DP are consistent with thallium nitrate having been added to Q1, Q2, and Q3. (T. 161) The dictation states in part, "[t]he contents of Q1 through Q3, laboratory number 81205002, D-S-W-W-R-F-T-L-V-Y, were analyzed for an ion associated with thallium. The nitrate ion was identified in Q1 through Q3. The Q1 through Q3 Cokes are consistent with thallium nitrate having been added to them." (T. 161) At trial, the state elicited his opinion regarding the results of the DP test. Martz responded, "[b]ased on that test, I concluded that thallium nitrate was added to the Coca-Cola." (T.T. 3557) When presented with his prior testimony, Martz admitted that his statement at trial was inaccurate. (T. 97) Martz pointed out that the error was in stating that the conclusion was based on one test. (T. 97) He maintained that the difference between something having been "added to" and something being "consistent with" was a matter of opinion. (T. 172-5)
Martz tested samples over a month or so, but did not record dates of specific tests. (T. 66) During the course of testing, he received a photograph from the experts at the Coca-Cola Company showing the results of their testing. (T. 65-6) The Coca-Cola Company showed that both thallium I nitrate and thallium sulfate could be added to unadulterated Coke without altering the appearance. Also, of the two types of thallium nitrate, thallium III nitrate altered the appearance of Coke while thallium I nitrate did not. (T. 69) Martz never attempted to mix thallium I nitrate with unadulterated Coke, and did not perform the DP and IC tests on this mixture to determine whether or not a chemical reaction occurred in the mixture which could have affected the test results. (T. 136)
Prior to trial, Martz had not attempted to quantitate the nitrate to determine whether the thallium nitrate was thallium I nitrate or thallium III nitrate. (T. 163) He explained that he did not believe he would be able to quantitate the nitrate. (T. 164) Martz later testified that he successfully quantitated the nitrate on his trip to Florida for the evidentiary hearing. He stated that the equations show a 1:1 relationship between thallium and nitrate in Q1 indicating the presence of thallium I nitrate. (T. 232)
Havekost examined Q206 and identified thallium nitrate. He then asked Martz to determine whether the thallium nitrate was thallium I nitrate or thallium III nitrate. Martz used X-ray Diffraction, Infrared Spectrometry, and Solid Probe Mass Spectrometry to identify nitrate, and he weighed the sample. (T. 181) In his opinion, it was 90-99% pure Thallium I Nitrate. (T. 181)
According to Martz, in his 23 years with the FBI, thallium was an uncommon substance in the lab and there was no established protocol for handling it, unlike more common substances such as cocaine, arsenic or methamphetamine. (T. 167-70) At the time of trial, the state asked Martz if he could establish a link between the thallium nitrate in the Coke and the thallium in the powder using the IC and DP tests. At trial, he explained that the difference between thallium I nitrate and thallium III nitrate is the amount of nitrate, and that the tests indicate whether a substance is present in a solution rather than the amount of the substance. Therefore, the tests *417 could not be used to distinguish between thallium I nitrate and thallium III nitrate. (T. 3559) He testified at the hearing that he was unable to make any connection between the two until he worked through the quantitative analysis of the nitrate in Q1. (T. 170)
B. THOMAS JOURDAN
Special Agent Thomas Jourdan, Ph. D., Unit Chief in the FBI Crime Lab Materials and Devices Unit, testified at the hearing regarding his role in reviewing Martz's work in State v. Trepal. His superiors at the FBI asked him to examine those portions of the case pertaining to analysis of Q1, Q2, and Q3, and offer rebuttal to the OIG Report. (T. 268) Later, the OIG interviewed Jourdan regarding his review of Martz's work.
The job of a forensic examiner is to show a difference between questioned specimens and known specimens. (T. 274) In his discussion of test results, Jourdan focused attention on the spot tests and the IC test which advanced the case by differentiating between Q1, Q2, and Q3 and the unadulterated Coke. Jourdan said Martz should have run blanks on the IC, and the spot tests to assure accurate results. (T. 270) For the remaining tests, MS, SEM and XRD, Jourdan opined that the absence of blanks didn't affect the strength of Martz's conclusion because these tests did not advance the case. (T. 276-7)
Jourdan testified that Martz's notes lacked detail. (T. 267) He observed that some test results were not dated, and the spot test results did not indicate whether they were positive or negative. He noted that Martz used the spot tests to differentiate between Q1, Q2, and Q3 and the unadulterated Coke. Knowing that the results were the same for all suggested that there was no difference between Q1, Q2, and Q3 and the unadulterated Coke, and that neither sulfate nor chloride was added. (T. 266) The FBI Lab standard at the time Martz conducted his examination was that lab notes be sufficiently detailed to remind the author what tests and procedures he had performed. (T. 266)
Jourdan would not have accepted Martz's dictation for the DP and IC tests because it contained unfounded conclusions about the contents of Q3. (T. 281) He pointed out that Martz had received Q3 with directions to identify the ion associated with thallium. Martz performed spot tests on Q3 along with Q1 and Q2. The results suggested there was no difference between Q3, and the other two Q samples. Martz's notes show that Q3 produced a positive result on the DP test. Jourdan concluded that, at most, Martz's notes support the conclusion that Q3 contained thallium and some kind of oxidizing agent. (T. 282) Nothing in the notes or the testing supports any more definitive conclusions about Q3.
Although Martz's notes did not indicate the order in which he performed the tests, Jourdan summarized them in the following logical sequence. (T. 285-7) Jourdan explained that water-soluble thallium salts exist in three forms: nitrate, sulfate, and chloride. Therefore, an examiner would look for thallium nitrate, thallium sulfate and thallium chloride. (T. 285) The barium chloride test result suggests that sulfate ion was not added. (T. 286) Likewise, the silver nitrate test result suggests that chloride was not added. (T. 286) Next, the positive DP result in Q1, Q2, and Q3 with the negative in unadulterated Coke suggests the presence of an oxidizer. The results, taken together, suggest that of the three types, nitrate is the oxidizer present. However, Jourdan stressed that these tests are presumptive and *418 additional proof is needed. (T. 286) Jourdan offered no criticism of the IC testing procedure. Despite problems he cited in some of Martz's procedures, testimony, and dictation, Jourdan concluded that Martz's data was scientifically sound. Jourdan stated:
From my review of the four corners of this documentand this document is the notes that I was provided with by the Inspector General's Office that were told to me to be Agent Martz's noteslooking at the four corners of this document, I believe that heI believe that it can be shown, and I can demonstrate if you like, that to a reasonable scientific certainty thallium nitrate was added to Q1 and Q2; and I can really say nothing about Q3, other than that it appears that there is an oxidizing agent involved.
(T. 295, 312)
Jourdan in fact used IC charts to determine the amount of nitrate in Q1 and Q2. (T. 299) He discussed how the nitrate could be quantitated and provided equations based on Martz's IC charts, which he believed, demonstrate to a reasonable scientific certainty that the type of thallium in Q1 and Q2 is thallium I nitrate. (T. 297-304) After having quantitated the results, Jourdan concluded that beyond a reasonable scientific doubt, thallium I nitrate was added to Q1 and Q2. (T. 321)
Jourdan discussed the differences between the idea that something has been "identified as" a substance and that something is "consistent with" the presence of a substance. (T. 291) When something is identified as a given substance, there is a high level of confidence so that other possibilities are ruled out. Conversely, "consistent with" means that no contradictory information has been developed; it is a less confident response. (T. 291) In Jourdan's opinion, Martz's notes support a stronger conclusion that "beyond a reasonable scientific doubt, thallium nitrate" was added to Q1 and Q2. (T. 319)
C. STEVEN G. BURMEISTER
Steven G. Burmeister, Unit Chief in the Chemistry Unit of the FBI Lab, testified regarding his review of Martz's work in the Trepal case and the OIG report. Burmeister criticized Martz for failing to do standard runs on the IC machine to establish a baseline for certain ions. He noted that the list of ions he would test for was based on his experience in explosives analysis. (T. 342) Burmeister's personal standard for evaluating the IC work was higher than the standard in the scientific community. (T. 344) Having reviewed Martz's report check and the OIG report, Burmeister concluded that to a reasonable degree of scientific certainty, thallium I nitrate was added to Q1 and Q2. (T. 369, 371) He noted that his opinion would be slightly less confident without Jourdan's quantitative analysis. (T. 372)
D. MARLAND D. DULANEY
Marland D. Dulaney, Ph.D., Forensic Toxicologist, was extremely critical of Martz's methodology and the analyses provided by Jourdan and Burmeister. In a discussion of the IC tests, he opined that no one could have excluded chloride and sulfate ions without comparing the test runs to standard runs. (T. 387-8) He pointed out that when working with two unknown substances like Coke, and Q1, Q2, and Q3, the scope of testing must be broader. He stated that Martz should have run standards of nitrate in unadulterated Coke rather than nitrate in water. (T. 411-2) He observed that one cannot extrapolate the results of a nitrate and water solution on an IC run to determine what happens when nitrate *419 is mixed with unadulterated Coke. (T. 394)
Dulaney challenged some assumptions underlying the FBI testing and claimed that Martz's methodology was so flawed that his results could not be trusted. (T. 415) First he questioned the accuracy of the quantitative analysis of the nitrate ion identified in Q1. (T. 400-3) He observed that the top portion of some IC graphs were flat. He suggested the concentration of the testing solution was so high that it produced readings which extended beyond the page. Dulaney pointed out that this was a simple mechanical problem that Martz should have corrected. According to Dulaney, it was especially important to have made the correction because the quantitative calculations were based on the height of the peaks. After pointing out the graphing problem, he suggested that any calculations derived therefrom were flawed. Next, he questioned Jourdan's assertion that only three thallium salts are water-soluble. (T. 409) He pointed out that Reese, the Coca-Cola Company examiner, mixed Coke with thallium malonate, and thallium formate. While both substances foamed, he stated that they did not permanently discolor the solution. (T. 409) He suggested that other water-soluble thallium compounds should have been considered. (T. 409)
E. JAMES K. CADIGAN
James K. Cadigan was a Special Agent in the Firearms and Tool Marks Unit of the FBI Lab. He discussed his report on the tool marks left on the bottle caps from Q1, Q2, and Q3, and his trial testimony. The OIG report does not address Cadigan's work in this case. In his motion, Trepal claims that Cadigan testified falsely concerning the quality of evidence obtained from the bottle caps. He claims that Cadigan's findings, that certain tool marks were of limited value, contradict his trial testimony. Cadigan explained that it is his practice to assign a value to each tool mark upon his initial examination of an object as a means of prioritizing the steps in his examination. (T. 484)
F. FREDERICK W. WHITEHURST
Frederick W. Whitehurst, Ph.D., J.D., former FBI Special Agent and current Executive Director of the Forensic Justice Project in Washington, D.C., testified concerning his role in the OIG investigation and his observations of Martz's work on the Trepal case. Whitehurst was an examiner in the Material and Analysis Unit at the time of the hearing. He is the whistle blower who initiated the OIG investigation into FBI Lab practices. Whitehurst testified that Martz's approach to the analysis was below the scientific community standard, and his work lacked peer reviews. He is of the opinion that performing an IC test without running standards does not meet scientific standards. (T. 566) He explained that Martz's conclusion is dependent upon unknown information, such as the impact of unadulterated Coke on an IC run. (T. 567-8) Because the content of Coke is unknown, one cannot not assume what would happen if nitrate were added to it. (T. 568) He also observed that adding thallium standard to water is not a valid scientific method. (T. 596) He concluded that Martz could have appropriately told the jury, "[w]e have results that are consistent with and not proof of the presence of thallium nitrate and thallium nitrite." (T. 607-8) Beyond that, there is not enough data to distinguish between the two substances. (T. 613) He noted that the quantitative analysis is incorrect because of the problem described by Dr. Dulaney. (T. 572) As for the results of *420 Q206, one may conclude that it is thallium, and consistent with the presence of thallium nitrate. (T. 609)
G. DONALD G. HAVEKOST
Donald G. Havekost, a Forensic Consultant and retired FBI Special Agent, testified regarding his initial testing of Q206. Havekost observed the color and texture of the powder, weighed it, performed SEM, and identified the counter ion by DP and got a positive reaction. (T. 616) The DP test confirmed that the counter ion was nitrate.
H. JONATHAN STIDHAM
Jonathan Stidham was a member of Trepal's defense team. He testified regarding the defense strategy and how that strategy would have changed had they received a copy of Martz's notes and charts.
Testimony at trial established that Trepal was an unemployed chemist, who at one time, worked in a methamphetamine lab and had purchased P2P. (T. 645) P2P is a compound used to make methamphetamine, and thallium is a byproduct of the production of methamphetamine. Stidham believed that Q206 was the most important piece of evidence because the prosecution used it to link Trepal to the crime. (T. 638)
The defense team hired an expert at Georgia Institute of Technology in Atlanta, Georgia, to test samples from Q1, Q2, Q3, and Q206. Stidham conceded that the HRS Lab in Jacksonville found thallium in residue taken from the empty Coke bottles, and that the Centers for Disease Control in Atlanta found thallium in tissue samples taken from the victims. Similarly, he testified, their expert from Georgia Tech found thallium I nitrate in Q206 and thallium nitrate in Q1, Q2, and Q3. (T. 649-50) He also conceded that the defense team did not have any scientific evidence to support a theory that thallium was not the substance that poisoned the victims, (T. 650), or that thallium had not been added to the Cokes. (T. 642) The defense team never called their expert to testify at trial. According to Stidham, the defense wanted to show that the thallium in Q1, Q2, and Q3 came from a different source than the thallium in Q206. (T. 657)
The defense focused on trying to show that the thallium in Q1, Q2, and Q3 did not come from Q206. (T. 642) Stidham theorized that if the defense team had known of the testing procedures, they might have avoided disclosing Trepal's prior felony to the jury. (T. 646) Also, if the FBI had found something that was not a by-product of the manufacture of methamphetamine, that may have also aided the defense in keeping the prior felony out of evidence. (T. 647) He believed that the defense would have been able to cast doubt on the reliability of the testing if they had known the contents of the notes and charts at trial. (T. 642) They would have made a challenge under Frye that the information was unreliable and inadmissible. (T. 644) Also, the defense would have argued that the ruling in Brady trumps the discovery rule regarding notes. (T. 661)
I. DABNEY CONNER
Dabney Conner was also a member of Trepal's defense team. He has a chemistry background and testified at the hearing concerning the defense trial strategy, problems he observed in the FBI Lab testing procedures, and how the defense strategy would have changed had they known of the irregularities in the testing procedure.
The issue at trial was whether the thallium in Q1, Q2, and Q3 was the same type of thallium as that found in Q206.

*421 (T. 670) He believed that the defense and the jury were laboring under the misconception that the FBI Lab was infallible at the job of analyzing things. (T. 6723) He also believed that if the defense could have shown that the thallium in Q1, Q2, and Q3 had a different atomic weight than the thallium in Q206, they could have established that Q206 was not the source of the thallium in Q1, Q2, and Q3. (T. 674) Georgia Tech ran a mass spectrometry test the results of which showed no difference in the atomic weight of the thallium in Q1, Q2, and Q3, and Q206. (T. 674)
Conner testified that he would have used the OIG Report to possibly exclude Martz's testimony and the testimony of other witnesses by means of impeachment or pretrial challenge. (T. 667) Conner observed problems with the testing including Martz's "sloppy lab work," the failure to run proper baseline standards, and the use of certain machines. (T. 667-8) Conner also noted that sloppy procedure calls into question the validity of the results. (T. 668)
Although their expert at Georgia Tech provided results which revealed that the substance in Q1, Q2, Q3, and Q206 was thallium nitrate, (T. 677), Conner questioned the testing method employed by his expert. (T. 679) From his chemistry background, Conner understood that charts are generated by some of the machines used at the FBI lab, but did not request them. (T. 683) He deposed Martz at the FBI office in Washington, D.C., and Martz complied with each request to produce documents. (T. 684-5) In light of the OIG report, Conner stated that his strategy would still be to try to show that Trepal was not the individual responsible for tainting the Cokes. (T. 693)
(Footnotes omitted.) After summarizing the testimony of the witnesses, the circuit court evaluated the conflicting testimony and made findings, as explained below.

C. Findings

The circuit court made the following findings concerning the relative credibility of the witnesses who testified at the second evidentiary hearing:
The court has struggled to reconcile testimony of the various experts. It cannot be done. The court will make findings on the credibility of the important witnesses rather than list the variances in each witness's testimony. The court has utilized all the tools available to the trier of fact as set out in the standard credibility instruction, and for reasons which follow, the court finds that Martz is not credible, portions of Jourdan's and Burmeister's testimony are not credible, and Whitehurst and Dulaney are highly credible. The court finds that Cadigan did not testify falsely at trial. His explanation of certain findings contained in his notes were plausible and otherwise consistent with his report. The court will also make findings regarding defense testing of Q1-Q3 and Q206.
The FBI placed Martz on temporary assignment for several years as a result of the investigations into his work at the FBI lab. It is understandable that he would have an interest in bolstering his trial opinion and regaining his job status. On some points, Martz was candid. He admitted testifying falsely at trial. On others points, his testimony at the evidentiary hearing was evasive, and misleading. Martz testified falsely at trial when he stated that a positive result on the DP test will yield a blue color indicating the presence of nitrate. In fact, the blue color indicates the presence of an oxidizer which could, among *422 other things, be nitrate. Martz misled the jury when he testified that nitrate was not present in unadulterated Coke. In fact, IC testing revealed a substance which could have been nitrate. Although according to Martz, a subsequent DP test did not turn the Coke blue to confirm the presence of an oxidizer. This information would have been useful to the jury. Testimony at the evidentiary hearing revealed that the IC tests were not properly run. Although the IC test is not conclusive, when properly run, it is strong evidence that a substance is present.
Martz testified falsely at trial that he had run Q3 on the IC. Withholding information can constitute a falsity. See Giglio v. United States, 405 U.S. 150, 154 [92 S.Ct. 763, 31 L.Ed.2d 104] (1972). That is the case here. Martz failed to reveal that he had done additional testing on Q1, Q2, and Q3. The court finds this particularly important because the defense could have used this information to suggest that Martz was not satisfied with the initial results and sought additional data. His notes indicated a finding "consistent with" not "added to," and the fact that he performed additional tests, by inference, supports the conclusion in his notes. Martz never explained why he wrote one thing in his notes and testified to something else. Any attempt to say they mean the same thing does not hold water. Jourdan and Burmeister accurately criticized the testing procedure as sloppy. Such criticism casts doubt on Martz's conclusions.
The court has found that Martz would have been justified in testifying that test results were consistent with the presence of nitrate in Q1 and Q2. As to Q3, he could have testified that it contained an oxidizing ion. The court recognizes the State's argument that because Martz gave his opinion at trial, his opinion can be incorrect but not false. In most instances that would be an accurate statement. However when Martz's testimony is taken in its entirety, it supports two possible conclusions: (1) Martz is an incompetent examiner who did not knowingly testify falsely; or (2) Martz is quite skilled and knowingly colored his testimony. There is no doubt that the data available at the time of trial did not support the opinion Martz offered and that he knew it.
The FBI selected Thomas Jourdan and Steve Burmeister to represent the agency at the OIG hearing. The court believes their roles in the OIG investigation colored their testimony at the evidentiary hearing. In their criticism of Martz's testing and reporting methods, they noted specifically that some results were not labeled or mislabeled, lab notes contained insufficient detail, and certain tests were improperly run. Despite their criticism, they concluded that Martz's work met standards of the scientific community. Each then stated that the data supports Martz's trial testimony that thallium nitrate was added. However, it is important to note that their opinions are based on the portion of the FBI lab report prepared by Martz as well as the subsequent quantitative analysis. The court finds their discussion of facts and test procedure to be credible, but rejects their conclusion that the test data supports Martz's trial testimony.
It is also important to understand that Martz and Jourdan performed the quantitative analysis just prior to the evidentiary hearing. While the analysis itself was properly calculated, the court is concerned that the result may be unreliable because the data, taken from the IC charts, was likely flawed. Testimony at *423 the hearing has indicated that the IC charts were flawed because of the graphing problem described earlier, the failure to run blanks, and the failure to run a standard consisting of nitrate and unadulterated Coke. Martz relied on the IC charts; Jourdan used data taken from Martz's notes. Burmeister's opinion of Martz's work was also shaped by the quantitative analysis. While there is a possibility that the substance is in fact thallium I nitrate, the court declines to so find. The court rejects Jourdan's and Burmeister's conclusion that the data supports the conclusion to which Martz testified at trial.
Whitehurst, the whistle blower and former FBI lab examiner, had an interest in seeing that his allegations against Martz and the lab were viewed as credible and meritorious. Despite his interest, the court finds him to be credible and accepts his opinion that Martz could have appropriately stated that the results were consistent with the presence of, although not proof of, nitrate.
Dulaney, the defense expert who testified regarding the scientific standard and testing procedures, is a highly qualified academician subject to attack based on a "real world" versus "purely academic world" analysis. Dulaney was nonetheless highly credible in his discussion of scientific testing procedures. Because testing procedures are universal regardless of the circumstances calling for testing, this court accepts his opinion and finds that the measure of scientific proof required by the scientific community was not satisfied by Martz's testing sufficiently to permit Martz to conclude that thallium nitrate was added to Q1 and Q2.
It is important to note that the defense expert from Georgia Tech tested samples of the materials. He was not listed as a witness by the defense at trial. The prosecution, after prevailing on the issue of whether they were entitled to call him or use his report, did neither. The court does not know the objectives of his testing, or what tests he performed. We know, only through the hearsay testimony of defense counsel, that he found thallium I nitrate in Q206 and thallium nitrate in Q1-Q3.
That defense counsel accepted these results and settled on an alternative approach to attack the prosecution argument concerns the court. Part of the prosecution argument is that even if Martz used improper testing protocol and lied, he, in fact, came to a conclusion which can be proven correct. Assuming the Georgia Tech chemist would have agreed with the testimony of the other chemists in this case, his presence at trial would have had an impact. Had he been present for Martz's testimony, it is quite likely that Martz could have been seriously impeached.
After the circuit court made the above findings, the court proceeded to summarize and address Trepal's claims.

D. Circuit Court's Analysis

To facilitate its analysis of Trepal's twenty-one claims, the circuit court grouped the claims under four legal theories and then addressed each theory:
Martz's conduct at trial was outrageous and shocking, and the apparent lack of supervision which allowed this misconduct is troubling. Nevertheless, the court must consider the legal effect of his actions in determining whether Trepal is entitled to relief.
Trepal makes numerous claims in his motion; few of which are clearly delineated. The court has identified, numbered and grouped twenty-one claims into categories for ease of analysis. The *424 categories are: newly discovered evidence; ineffective assistance of counsel; Brady and Giglio claims; and cumulative error. For each claim, it is not enough for a defendant to establish an alleged error, the defendant must also show that he was prejudiced by the alleged error. In considering the claims, the court must look to the effect the evidence would have on the jury verdict, both in the guilt phase and the penalty phase. Although the legal standards differ among most of the doctrines, the question of the impact on the jury is common to all. ...
....
A. NEWLY DISCOVERED EVIDENCE
Trepal argues that the OIG report and other Justice Department documents constitute newly discovered evidence and show that the prosecution presented inadmissible scientific evidence. Newly discovered evidence is information that was unknown to the trial court, to the party, and to counsel at the time of trial, was undiscoverable by due diligence, and would probably produce an acquittal at retrial. See Robinson v. State, [770 So.2d 1167] 2000 WL 1473147 (Fla.); Blanco v. State, 702 So.2d 1250, 1252 (Fla.1997). To qualify as new evidence, it must be admissible. Jones v. State, 709 So.2d 512, 521 (Fla. 1998). The OIG report would be inadmissible hearsay. See Norton v. State, 709 So.2d 87, 95 (Fla.1997); Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc., 630 F.2d 250, 262 (5th Cir.1980). Further, it did not exist at the time of trial. Other documents produced in the Justice Department investigation are the subject of a protective order and are not part of the court file. They cannot be considered as evidence. See Buenoano v. State, 708 So.2d 941 (Fla.1998). Further, the charts, graphs, and lab notes which are the basis of the investigative report are not subject to disclosure. See Terry v. State, 668 So.2d 954, 960 (Fla. 1996). Realistically, all these documents are ones that were not in existence at the time of the trial, or were not discoverable, but are actually the indication of false testimony at trial. The core of Trepal's case is that the prosecution relied on false and misleading evidence at trial. This is not newly discovered evidence in the normal sense. It is better addressed as a Giglio claim and that aspect will be discussed later. In addition, even if this material is considered newly discovered evidence, the court cannot find that this material would probably produce an acquittal or a life sentence at trial.

B. INEFFECTIVE ASSISTANCE OF COUNSEL
Trepal raises a claim of ineffective assistance of counsel for trial counsel's failure to discover evidence of laboratory misconduct. A successful claim will show deficient performance and prejudice to the defense. See Strickland v. Washington, 466 U.S. 668, 687 [104 S.Ct. 2052, 80 L.Ed.2d 674] (1984); Robinson v. State, [770 So.2d 1167] WL 1473147 (Fla.2000).
The first question is whether their performance was deficient. What did counsel fail to do? They could not have secured lab notes since the notes were not subject to discovery. They could have had a chemist present during trial to advise them on appropriate testing procedures and cross examination, or they could have accomplished this during discovery. They could have educated themselves as to the proper testing procedures in advance of trial. Had the defense taken any of these measures, Martz would have been seriously impeached. The defense relied on the FBI *425 lab report which stated that the test results showed thallium consistent with the presence of nitrate. (T. 672-3) In hindsight, they were not justified in doing so. When Martz testified differently at trial, defense counsel failed to attack his changed conclusion. The court is compelled to find their performance deficient. The court does this with great reluctance because it can foresee a flood of requests to have a defense chemist at trial in routine lab testimony.

Did the deficiency prejudice the defense? This, in turn, depends on whether "counsel's ineffectiveness was such as to `undermine confidence in the outcome.' " Robinson v. State, [770 So.2d 1167] WL 1473147 (Fla.2000) (Anstead, J., special concurrence). The court finds that ... the outcome would be the same at the guilt phase.

Taking the narrow view of the penalty phase, we look to what the jury was instructed. Under the standard jury instructions, the jury was told to consider the appropriate aggravating and mitigating factors as set out in the standard jury instructions. The instructions do not include residual doubt. The court finds that there is no reasonable probability that the [sentence] would have been different ....
....
C. BRADY AND GIGLIO CLAIMS
Trepal alleges a discovery violation for the prosecution's failure to make full disclosure of testing procedures contained in lab notes in violation of Brady. The holding in Brady states that suppression of exculpatory evidence after defense request violates due process when evidence is material to guilt or punishment. See Brady v. Maryland, 373 U.S. 83, 87 [83 S.Ct. 1194, 10 L.Ed.2d 215] (1963). Brady has come to stand for the proposition that the prosecution has a duty to disclose exculpatory evidence whether the defense makes a specific request, a general request, or no request. See Kyles v. Whitley, 514 U.S. 419, 433 [115 S.Ct. 1555, 131 L.Ed.2d 490] (1995); Bagley v. United States, 473 U.S. 667, 678 [105 S.Ct. 3375, 87 L.Ed.2d 481] (1983) [ (1985) ]; United States v. Anderson, 574 F.2d 1347, 1354 (5th Cir.Ga.1978). The notes were not exculpatory prior to trial. They could only be regarded as exculpatory after Martz testified. There was no Brady violation of the type dealt with in this section.
He also claims a violation of Giglio for use of false testimony at trial. Giglio v. United States, 405 U.S. 150 [92 S.Ct. 763, 31 L.Ed.2d 104] (1972). The problems with test procedures are so wrapped up with the false testimony issues that they must be dealt with here. Claims 16-21 raise the issue of false testimony presented at trial under Giglio. Giglio holds that a conviction based on false or perjured testimony, which the prosecution knew or should have known was false, violates due process when such information is material. The materiality prong is the same as that used in Brady. See Rose v. State, [774 So.2d 629] WL 1508576 (Fla.2000). False information is material if "there is a reasonable likelihood that it could have affected the jury verdict." Id.

In examining the effect on the jury, what must the court consider? The question implies a comparison. Trepal would have the court compare actual testimony with impeachment testimony which would have revealed all these problems at trial. Realistically, if all this had been known in advance of trial, Q1, Q2, and Q3 would have been retested. On the other hand, the prosecution would have us look to what the substance *426 in Q1, Q2, and Q3 really is, including reliance on the quantitative analysis. The court has previously rejected these positions and indicated that for this analysis the actual testimony should be compared to what Martz could have truthfully testified to at trial.

As to the guilt phase, the court finds... that there is no reasonable likelihood that the verdict would have been different. This case was based almost entirely on circumstantial evidence. The testing results of the Coke samples and Q206 were the only direct evidence of Trepal's guilt. Even so, given the test results that Martz could have rightfully testified about and considering all the other evidence in the case, the court finds no reasonable likelihood that the guilt phase results would have been different. Although this is a circumstantial evidence case, the evidence was strong.

Turning to the penalty phase .... Under the standard jury instructions, the jury was told to consider the appropriate aggravating and mitigating factors as set out in the standard jury instructions. The instructions do not include residual doubt. The court finds that there is no reasonable likelihood that the verdict would have been different.

....
D. CUMULATIVE ERROR
The cumulative error doctrine applies when there are other claims supported by competent evidence, but they do not meet the criteria for securing relief. In that instance, the court must consider the cumulative effect of the evidence. If under the unique circumstances of the case, confidence in the outcome has been undermined, and a reasonable probability exists that the outcome would be different, relief may be granted. See State v. Gunsby, 670 So.2d 920, 924 (Fla. 1996) (citing Cherry v. State, 659 So.2d 1069 (Fla.1995) and Harvey v. Dugger, 656 So.2d 1253 (Fla.1995)).
The cumulative effect doctrine is only relevant if the other claims have been rejected. They have under the narrow view. Under the narrow view, the court finds that cumulative effect claim lacks merit because the cumulative effect of errors, if any, is not sufficient to undermine confidence in the outcome. See Rose v. State, [774 So.2d 629] WL 1508576 (Fla.2000).... [T]he court cannot find that confidence in the outcome has been undermined or the reasonable probability of a different outcome.

(Footnotes omitted and emphasis added.)

E. This Court's Analysis

The gist of the circuit court's analysis of subclaim (a) is that, regardless of the legal theory under which Trepal's assertion of "false and misleading scientific testimony" is analyzed, "the question of the impact on the jury is common to all." After evaluating the conflicting testimony of the witnesses, the court concluded that Trepal was not impermissibly prejudiced by the testimony of Martz. We agree.[12]
As noted above, the issue posed in subclaim (a) is whether Martz's improprieties impermissibly tainted the trial. This issue is a mixed question of law and fact, and this Court in State v. Glatzmayer, 789 So.2d 297 (Fla.2001), articulated the proper standard of review for an appellate court to apply when reviewing a trial court's ruling on a mixed question of law and fact of this sort:

*427 If the ruling consists of a mixed question of law and fact addressing certain constitutional issues (e.g., probable cause, reasonable suspicion, the "in custody" requirement under Miranda, ineffectiveness of counsel), the ultimate ruling must be subjected to de novo review but the court's factual findings must be sustained if supported by competent substantial evidence. See, e.g., Stephens v. State, 748 So.2d 1028 (Fla.1999).
Glatzmayer, 789 So.2d at 301-02 n. 7.
In the present case, the circuit court found that the following statements made at trial by Martz were improper for the following reasons:
Martz stated: "And when you pour that [i.e., diphenylamine or DP] into a solution which contains a nitrate you get a blue color." (The circuit court, however, found as follows: when you pour DP into a solution that contains an oxidizing ionwhich may or may not be a nitrateyou get a blue color.)
Martz stated: "Based on that test [i.e., the DP test] I concluded that thallium nitrate was added to the Coca-Cola." (The circuit court, however, found as follows: all that could be concluded based on the DP testin conjunction with the other testswas that the test results were consistent with the presence of thallium nitrate.)
Martz stated: "No nitrates were present in the unadulterated Coca-Cola." (The circuit court, however, found as follows: ion chromatography or IC testing showed the presence of a substance that could have been a nitrate in the unadulterated Coke.)
"In this particular case, when I tested the Coca-Cola [via IC] the results were positive for the nitrate ion." (The circuit court, however, found as follows: the IC test can show only the presence of an oxidizing ionwhich may or may not be a nitrate.)
Martz was asked: "Did you test each of the samples on the ion chromatograph to determine whether nitrate was present?" He responded: "Yes, I did." (The circuit court, however, found as follows: Martz did not test each sample. He did not test the third sample, i.e., Q3, on the ion chromatograph.)
Martz stated: "On three samples that I tested, all three contained nitrate ions." (The circuit court, however, found as follows: on two samples that Martz tested, all that he appropriately could have attested to was that the tests were consistent with the presence of a nitrate; and that on the third sample, the tests were consistent with the presence of an oxidizing ionwhich may or may not have been a nitrate.)
Martz was asked: "Based on those two tests [i.e., DP and IC], is it your opinion that what was in those three Coca-Colas, sir, was thallium nitrate?" He responded: "That is correct." (The circuit court, however, foundas noted abovethat all that Martz appropriately could have attested to was that the tests were consistent with the presence of thallium nitrate.)
Regardless of the above improprieties in the testimony of Martz (and regardless of the improprieties in his testing practices and omissions in his testimony), the following conclusions nevertheless can properly be drawn from the present record:
Peggy Carr died from ingesting thallium (of an undetermined type).
Of the various forms of thallium, only thallium sulfate and thallium nitrate (sub-group I) dissolve in Coca-Cola without changing the appearance of the Coke or foaming out of the bottle.
The brown bottle found in Trepal's garage contained (a) thallium, and (b) an *428 oxidizing ion consistent with the presence of a nitrate.
Five empty Coca-Cola bottles found in the Carr household contained thallium (of an undetermined type).
Tests on two unopened bottles of Coca-Cola found in the Carr household (a) showed the presence of thallium, and (b) yielded results that were consistent with the presence of a nitrate.
Tests on a third unopened bottle of Coca-Cola found in the Carr household (a) showed the presence of thallium, and (b) yielded results that were consistent with the presence of an oxidizing ion (which may or may not have been a nitrate).
When the above conclusions are combined with the other circumstantial evidence of guilt in this case (summarized above in this Court's opinion on direct appeal), we agree that the prejudice suffered by Trepal as a result of Martz's improprieties was insufficient to warrant a new trial. Applying the Glatzmayer standard of review, set forth above, to the circuit court's ruling on this subclaim, we conclude that the court's factual findings are supported by competent, substantial evidence in the record, and the court properly concludedbased on those findings that the prejudice suffered by Trepal was insufficient to warrant a new trial. We find no error.
IV. SUBCLAIM (b): INEFFECTIVENESS OF TRIAL COUNSEL
In his second subclaim, Trepal asserts that trial counsel was ineffective in failing to engage the services of a toxicology expert to challenge the State's evidence. Trepal asserts that lack of a toxicology expert rendered defense counsel deficient in the following ways: (1) in failing to investigate the presence of arsenic in the bodies of Peggy Carr, Duane Dubberly, and Travis Carr; and (2) in failing to investigate evidence showing that thallium was found under the sink in an apartment on the Carr property.[13] Trepal contends that he was impermissibly prejudiced by counsel's deficiency. We disagree.
The United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), set forth the following two-pronged standard of proof for a trial court to apply when evaluating a claim of ineffectiveness of trial counsel:
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
Strickland, 466 U.S. at 687, 104 S.Ct. 2052. The Court in Strickland explained at length both the first and second prongs of the above test and noted that both prongs are mixed questions of law and fact.[14]
*429 This Court in Stephens v. State, 748 So.2d 1028 (Fla.1999), set forth the abiding standard of review for an appellate court to apply when reviewing a trial court's ruling on an ineffectiveness claim. We later summarized that standard as follows:
The standard of review for a trial court's ruling on an ineffectiveness claim also is two-pronged: The appellate court must defer to the trial court's findings on factual issues but must review the court's ultimate conclusions on the [performance] and prejudice prongs de novo.
Bruno v. State, 807 So.2d 55, 61-62 (Fla. 2001).
As for Trepal's first point under this subclaim, i.e., that trial counsel was ineffective in failing to challenge the State's case concerning the increased levels of arsenic found in the victims' bodies, the circuit court heard testimony relating to this point at the first evidentiary hearing and concluded as follows:
The court allowed the defendant to inquire as to trial counsel's alleged failure to address the elevated amounts of arsenic in the urine of Peggy Carr, Duane Dubberly and Travis Carr. (See, rule 3.850 motion, p. 100-2.) The court believes that this issue was one of the most important claims raised in the rule 3.850 motion.
The evidence available at the time of trial was that Peggy Carr, Duane Dubberly and Travis Carr all had been exposed to arsenic. Dr. Marland Dulaney testified as an expert in toxicology for the defendant at the evidentiary hearing. Dr. Dulaney's opinion was that there were two separate poisoning attempts. The first was a chronic (small doses over time) exposure to arsenic. The second was an acute (high dose at one time) exposure to thallium. The doctor agreed, however, that the cause of Peggy Carr's death was the exposure to thallium.
An important piece of information that Dr. Dulaney relied upon in formulating his opinion was a test performed on Peggy Carr on October 31, 1988. The results of that test revealed that Mrs. Carr had 616 micrograms of arsenic in her urine. A normal level of arsenic is 25 micrograms. However, there is evidence that the 616 microgram result may have been unreliable. Dr. Robert VanHook, who treated Mrs. Carr at the Winter Haven hospital, testified in a deposition given on September 5, 1990, that "one test came back suggesting that arsenic level was elevated but apparently this was never confirmed." (R. 7956). Based on the initial lab report of 616 micrograms, Dr. VanHook began BAL (British Anti-Lewisite) therapy to combat the perceived high arsenic levels. Dr. VanHook testified that "[h]owever, the following day we got a call from the state lab indicating that their tests for arsenic were conflicting. So as I remember no further therapy specific for arsenic was done." (R. 7958). The doctor further testified that Mrs. Carr's hospital progress reports stated that the hospital received a "[c]all from state last night indicates conflicting results on the arsenic tests. BAL stopped." (R. 7960). In response to a question about why the BAL treatment was discontinued, Dr. VanHook said "[b]ecause of information from the state lab that they had conflicting reports regarding the analysis [of arsenic in the urine sample]." (R. 7967). During the state's examination, the following discussion occurred:
STATE ATTORNEY: Are you or do you have an opinion with regard to the elevated level being at 625 [sic] and apparently the lab at CDC not finding any arsenic in this person's *430 body? What I'm trying to get at is would you expect to see arsenic in a decreasing level if it really was at 625 [sic] or could it have been at 625 [sic] and be zero the next day and that be a rational thing?
DR. VANHOOK: I would not expect that but I'm not an arsenic expert.
(R. 7974).
Dr. T. Richard Hostler, Peggy Carr's primary physician at Winter Haven Hospital, testified in a deposition on August 24, 1990, that he remembered "one report in which arsenic was found in trace amounts." (R. 7392). Dr. Hostler was referring to a report which stated that on November 15, 1988, Peggy Carr had 36 micrograms in her urine over a 24 hour period. Dr. Hostler stated that because the normal level was 25 micrograms in a 24 hour specimen he "personally [did] not consider 36 micrograms to be a clinically relevant or significant elevation therefrom." (R. 7394).
Dr. Michael Wilder, who at the time of the poisoning was the State Epidemiologist, testified in a deposition given on August 7, 1990, that "there was arsenic found in one of the urine samples. There was, when it was first reported from the laboratory in California, there was some uncertainty as to the level of importance that that [level of] arsenic might have. In other words, after some discussion with the folks at CDC it was discerned that the level of arsenic was not incompatible with the [level] normal[ly found] from eating oysters, and so forth." (R. 6521-22) (additions in brackets added from the errata sheet submitted by Dr. Michael Wilder on September 5, 1990.)
Another important piece of evidence Dr. Dulaney relied upon was the pattern of Peggy Carr's symptoms. Evidence revealed that Peggy Carr went to Bartow Hospital feeling sick on October 24, 1988. She was discharged on October 27, 1998 [sic], when she felt better. On October 30, 1988, Peggy was feeling very sick and Pye Carr brought her to Winter Haven Hospital. Dr. Dulaney's theory is that Peggy Carr was being poisoned with a low dose of arsenic when she became sick on October 27. Once in the hospital, the source of arsenic was removed and her condition improved. She then returned home, and was exposed to arsenic and thallium. Her condition worsened and she was admitted to the hospital three days later. This theory comports with Dr. Dulaney's opinion that there were two separate poisoning attempts.
However, other doctors have different opinions on why Peggy Carr became sick, improved and became sick again. A section of a CDC article titled "A Cluster of Acute Thallium Poisoning in Florida, 1988," stated that:
Patient A [Peggy Carr] reportedly drank half of a bottle on October 22, put the bottle in the refrigerator and drank the remaining soft drink the next day. On October 23, patient B [Travis Carr] drank at least 4 ounces from another bottle while Patient A's husband had a `Bourbon' mixed with 1/4 of a glass from the same bottle; on that occasion the 2-year old granddaughter drank `a small amount' from the same bottle. When Patient A came back home from her first hospitalization 5 days after her first onset she shared another bottle of soft drink with her son (patient C) [Duane Dubberly], who consumed about 4 ounces of it. The time interval between soft drink consumption and occurrence of first neurologic symptoms ranged from 1 to 3 days for the 3 symptomatic *431 cases, the shortest being for patient A who reportedly drank the largest amount of soft drink.
(R. 6447).
Dr. Karl Klontz, the Medical Executive Director of the Department of Health and Rehabilitative Services Epidemiology Program of the Disease Control Office, authored a memorandum on January 3, 1989, titled "A Thallium Poisoning Cluster In A Single Family, Polk County, Florida. October-November 1988." The memorandum stated that:
The clinical history of Mrs. P.C. [Peggy Carr], with an acute phase, followed by apparent improvement, and a secondary worsening phase suggest 2 successive exposures consistent with her history of Coke consumption.... The severity of illness and the concentration of urinary thallium correspond to the amount of Coke ingested by each poisoned case. Furthermore the clinical history of Mrs. P.C. is consistent with her 2 successive exposures to the contaminated Coke.
(R. 6565-66). Therefore, doctors both at the CDC and HRS believed that Peggy Carr's illness and symptoms were consistent with her consumption of the Coca-Colas laced with thallium. Neither doctor hypothesized that the first signs of illness were due to chronic exposure to arsenic, as Dr. Dulaney believes.
Thus, the defense team was faced with the knowledge that thallium caused Peggy Carr's death, but that the three victims also had arsenic present in their urine. Additionally, counsel knew that the initial arsenic test result on Peggy Carr, which showed an extremely high concentration of arsenic, was suspect. Counsel also knew that the state was not prosecuting the defendant for arsenic poisoning. It is not unreasonable for defense counsel to have focused their time and energy on refuting the allegation that Mr. Trepal killed Peggy Carr by thallium poisoning. Looking at the big picture of the trial, the presence of arsenic raised some questions, but counsel had to focus their efforts on what they knew (Peggy Carr died of thallotoxicosis). Furthermore, the evidence and arguments presented at the evidentiary hearing concerning the exposure to arsenic do not exclude the defendant as the guilty party in that poisoning as well. Based upon the uncertainty of the meaning of the arsenic levels, the uncertainty of the test result and counsel's own knowledge and strategy, the court finds that the defendant has failed to establish deficient performance and any resulting prejudice in the "failure" to present to the jury the evidence relating to arsenic.
As for Trepal's second point under this subclaim, i.e., that trial counsel was ineffective in failing to challenge the State's case concerning the presence of thallium found under the sink in an apartment on the Carr property, the circuit court heard testimony relating to this point at the first evidentiary hearing and concluded as follows:
The court allowed the defendant to inquire as to trial counsel's alleged failure to address the trace amount of thallium (sample 88120536) discovered under the sink in the apartment of the Carr property. (See, rule 3.850 motion, p. 98-100.) Trial counsel testified that the thallium under the sink was an important issue for them to explore. Wofford Stidham testified that he attempted to highlight the discovery of thallium in the garage apartment for the jury. The discovery was important because there was no evidence that the defendant had access to the garage apartment, and *432 therefore, improved the chance of successfully pointing the finger at Pye Carr as the poisoner. However, several of the state witnesses testified that the level discovered in the apartment was a trace amount which was insignificant. Also, Dr. William Coopenger, the administrator of the chemistry section of the Florida Department of Environmental Regulation, annotated a report authored by the Center for Disease Control by writing "[r]insings from one swab collected from the apartment kitchen contained thallium at a concentration of 9.916 mg/I. Swabs collected subsequently from the same area and analyzed at the FBI Laboratory failed to confirm this result." (R. 6448).
Even faced with evidence that the amount of thallium under the sink was negligible and that the FBI could not confirm the presence of thallium, counsel did continue to argue the issue, and the state had to attempt to rebut the argument during closing arguments (R. 4188-90). A review of the record indicates that defense counsel raised the issue and argued the inferences to the jury. Simply because counsel were not successful does not mean that they were ineffective.
Applying the Stephens standard of review, set forth above, to the circuit court's ruling on this subclaim, we conclude that the court's factual findings are supported by competent substantial evidence in the record, and the court properly concluded based on those findingsthat counsel was not ineffective under the Sixth Amendment. We find no error.

V. SUBCLAIM (c): OTHER EXCULPATORY EVIDENCE
In his third subclaim, Trepal asserts that other exculpatory evidence existed that should have been presented to the jury to establish reasonable doubt. He contends inter alia that trial counsel was ineffective in failing to investigate other suspects.[15] The circuit court heard testimony relating to this subclaim at the first evidentiary hearing and concluded as follows:
One portion of Claim # 3 alleged that trial counsel were ineffective for failing to present evidence of the "other suspects" to the jury. The focus of this portion of Claim # 3 is that the jury should have known that Pye Carr (husband of the victim) and Diana Carr (wife of the defendant) were both suspects in the murder.
Wofford Stidham testified that the defense team wanted to show the jury that Pye Carr could have committed this crime. However, the lawyers were concerned because they did not have any substantive evidence that suggested Pye Carr was the poisoner. Wofford Stidham further testified that in order to point the finger at the man whose wife had just been poisoned and died, they needed stronger evidence than they did have. Additionally, many of Judge Mahoney's rulings, which were affirmed on appeal, precluded counsel from presenting much of the evidence they believed to be favorable to Mr. Trepal, and inculpatory of Pye Carr. Jonathan Stidham testified that a tactical decision was made that it would be better strategy *433 for the defense to argue that the state could not prove its case, rather than saying Pye Carr committed the crime. Jonathan Stidham stated that he believed that if the defense tried to allege Pye committed the crime, the jury would undertake a "Pye versus Trepal" analysis, and in such an analysis, Jonathan Stidham believed that Mr. Trepal "lost that race every time." The defense theory that developed was to raise reasonable doubt without actually pointing the finger at specific suspects.
As to Diana Carr, trial counsel testified that the defendant gave them specific instructions not to attempt to implicate his wife in any manner. This testimony was not contradicted by any witness. Therefore, it is undisputed that trial counsel were restricted by the express instructions of their client. Jonathan Stidham testified that the attorneys decided to try to raise the question of Diana Carr as a suspect in the closing argument of the guilt phase (R. 4246). Jonathan Stidham stated that Mr. Trepal did not know about this strategy and after the arguments were completed, Mr. Trepal was "very upset." Further, counsel felt that to try to implicate Diana Carr would have given credibility to the state's case. In order to argue the circumstantial evidence pointed to Diana Carr, the defense would necessarily have to argue that the circumstantial evidence was in fact evidence that the jury should consider, when the defense theory was to attempt to discredit the state's entire circumstantial evidence case. Another concern was that more of the circumstantial evidence pointed to the defendant rather than to Diana Carr.
A sub-issue as to Diana Carr has to do with the fact that defense counsel did not elicit the fact that she was testifying under immunity. Jonathan Stidham testified that he felt that Diana Carr's testimony was not helpful to the state so he saw no need to attempt to impeach her. This was clearly a tactical decision, which when considered along with the desires of Mr. Trepal not to implicate his wife, was reasonable and did not constitute ineffective assistance of counsel.
The defendant also claims that Carolyn Dixon (sister of Pye Carr) was a suspect and this information should have been presented to the jury. A specific claim raised in paragraph # 58, page 56 of the 3.850 motion concerned the court. The defendant claims that Carolyn Dixon told Laura Ervins that Peggy Carr had been poisoned with thallium some three days before the hospital knew thallium was involved. Testimony at the evidentiary hearing indicates that Carolyn Dixon did not know what the poison was prior to the announcement by the hospital. It does appears that there is some confusion over the actual date of the conversation between Carolyn Dixon and Laura Ervins. However, Jonathan Stidham testified that he knew about the conversation and wanted to raise the same argument that collateral counsel raised in the rule 3.850 motion. Jonathan Stidham testified that after investigating the issue, the dates did not check out and that he abandoned the issue. The defendant has failed to establish deficient performance or any prejudice regarding this issue.
Applying the Stephens standard of review, set forth above, to the circuit court's ruling on this subclaim, we conclude that the court's factual findings are supported by competent substantial evidence in the record, and the court properly concluded based on those findingsthat counsel was not ineffective under the Sixth Amendment. We find no error.

*434 VI. CLAIM 5 (INEFFECTIVENESS OF PENALTY PHASE COUNSEL)
Trepal claims that trial counsel was ineffective during the penalty phase in two ways: (a) in failing to present humanizing mitigating evidence; and (b) in failing to argue lingering doubt as a mitigating circumstance. Specifically, as to subclaim (a), Trepal argues as follows:
The mitigating evidence presented at the evidentiary hearing consisted of numerous friends and family who provided heartfelt testimony regarding Mr. Trepal's caring and generous reputation, as well as his distressed youth and the effects of being a gifted intellectual but social outcast. Mr. Trepal also presented numerous friends and fellow Mensa members who testified that Mensa was an innocuous social club with amiable members (including doctors, lawyers, and even a Polk County judge), who enjoyed each other's company and participated in harmless, intellectually stimulating activities. Simply put, Mensa was a social group like many others in most communities. This evidence was not presented to the jury, which instead was left with the impression that Mensa was a group of weird misfits that are dangerous and suspect. Finally, Mr. Trepal presented the testimony of Dr. Francis Smith, an expert in speech pathology, who explained that Mr. Trepal suffers from a neurologically-based speech impairment, as well as Dr. Hilda Rosselli Kostoryz, an expert in special education, giftedness, and higher learning, who explained the nature of Mr. Trepal's giftedness, how it affected him as both a child and adult in terms of social and professional interactions, and that among gifted people, Mr. Trepal is a "normal" individual.
As to subclaim (b), Trepal asserts that appellate counsel was ineffective based on the following reasoning:
Defense counsel had the unusual benefit of a stipulation by the State that "lingering doubt" evidence could be presented at the penalty phase, and the court permitted its introduction. Without any reasonable tactical strategy, and to Mr. Trepal's detriment, no lingering doubt evidence was presented. All of the information discussed in [claim (1) ] also affects the issue of penalty, and constitutes valid mitigation, particularly in light of the State's stipulation at trial.
The circuit court addressed both subclaims in its order denying relief on Trepal's first rule 3.850 motion. As for subclaim (a), the circuit court ruled as follows:
(2) Claim # 5 concerned the lack of mitigation evidence presented at the sentencing phase of the trial. This claim alleged ineffective assistance of counsel and the records did not refute the claim. See, Deaton v. Dugger, 635 So.2d 635 (Fla.1994). Trial counsel claimed that the failure to produce mitigation evidence was strategic (R. 4369-70 and 4397-98), but the court could not reach this conclusion without conducting an evidentiary hearing. After hearing the testimony at the hearing, the court finds that the decision not to present mitigation evidence was tactical and reasonable under the circumstances. There is no reasonable probability that the jury's recommendation would have been different had the proposed evidence been presented.
The specific examples of evidence that the defendant alleged should have been introduced in the penalty phase are listed below.
(a) CHARACTER EVIDENCE FROM MENSA FRIENDS
*435 At the evidentiary hearing, the defendant called several MENSA members to testify on behalf of Mr. Trepal. All the witnesses basically testified that the defendant was a nice, caring, intelligent, thoughtful, generous and non-violent individual. In cross-examination, the state attorney asked all of the witnesses if they knew that the defendant had been convicted of a felony in the 1970's, that he spent time in federal prison, that he and his wife engaged in sado-masochistic practices, that he had physically battered his wife, that his wife had to flee to a neighbor's house because Mr. Trepal was being violent, and that he had in his house a pornographic video depicting an actual murder. Most of these "bad acts" were referred to in a pre-trial motion in limine filed by the defendant. (R. 4905) Many of the witnesses did not know of these facts, and although all stated that their opinion of Mr. Trepal would not change, the impact on the jury would have been potentially devastating to the defense.
The trial attorneys testified that they were aware of the state's `bad character' evidence and that it affected their decision not to call any of the defendant's MENSA friends. The decision was obviously tactical, and after hearing the testimony and the state's cross-examination, the court finds that the decision was reasonable.
(b) ABILITY TO FORM CLOSE, LOVING RELATIONSHIPS
This mitigator would appear to rely upon much of the evidence from the defendant's family and MENSA friends. Once again, the potential that negative evidence would reach the jury affected counsel's decision not to introduce the evidence. The strategy was reasonable and did not constitute ineffective assistance of counsel.
(c) THE DEFENDANT WAS A MODEL PRISONER
No evidence was presented on this ground. Therefore, the court does not know if the defendant was a model prisoner. In any event, the court finds that the decision not to present this type of mitigation evidence, if it existed, was harmless.
(d) THE DEFENDANT HAS STRONG RELIGIOUS BELIEFS
No evidence was presented on this ground. Therefore, the court does not know if the defendant has strong religious beliefs. In any event, the court finds that the decision not to present this type of mitigation evidence, if it existed, was harmless. Further, it is conceivable that the state could have presented negative character evidence to rebut the potential mitigation evidence, so the decision appears to be tactical.
(e) FAMILY HISTORY WAS NOT PRESENTED TO JURY
Several of the defendant's family testified at the evidentiary hearing. The court finds that the decision not to present the family history and character evidence from family members was harmless. Further, it is conceivable that the state could have presented negative character evidence in rebuttal, so the decision appears to be tactical.
A portion of this claim related to the defendant being an intellectually "gifted" child. An expert in gifted children testified at the evidentiary hearing. The state asked the expert numerous questions about some of the defendant's letters and journal entries, which detailed criminal experiences and other bad acts, that the expert had relied upon in formulating her opinion. The material was extremely damaging to the defendant. To open the door to such evidence *436 during the penalty phase would have been a tremendous tactical mistake. Further, the court doubts that a jury who has convicted a man of one count of first degree premeditated murder and six counts of attempted first degree murder would find that the defendant's "giftedness" mitigated the crime.
Another part of the claim related to the defendant's speech impediment. An expert speech pathologist testified to the effects of stuttering on a child. The court finds that the decision not to present this type of mitigation evidence was harmless.
As for Trepal's claim that trial counsel should have argued lingering doubt to the penalty phase jury, the circuit court ruled as follows:
Prior to the start of the penalty phase closing arguments, the court announced "under Florida case law that to argue residual doubt to the jury is improper at this stage." The state attorney told the court that "my opinion disagrees with the court's. I think residual doubt is something that the defense can argue if they want to." (R. 4370-72). The rule 3.850 motion alleged that even though counsel was given permission to argue lingering doubt, counsel failed to do so and therefore was ineffective.
A portion of the lingering doubt argument would have to focus upon other suspects. As noted previously, the defendant told his lawyers not to argue Diana Carr committed the crime. There has been no evidence presented to suggest that the defendant had changed his position on this issue.
The other potential suspect was Pye Carr. Trial counsel testified that they did not have any evidence that Pye Carr was involved in the poisonings. Trial counsel had numerous problems with blaming Pye Carr. Some of the reasons were that it was his wife who died; his son was the sickest of the two boys poisoned; there was no evidence to suggest a motive; there is no evidence that Pye had the knowledge and ability to use thallium; and Pye had ingested thallium as well. Trial counsel testified that during the guilt phase the decision was made that counsel would not continue to point the finger at Pye Carr because counsel believed that their credibility with the jury would ultimately be lost if they continued. The same concerns would have been present at the penalty phase.
The defendant lists other potential areas of lingering doubt that trial counsel should have argued, but the court finds that the decision not to argue lingering doubt was ultimately harmless and that there is no reasonable probability that the jury's recommendation would have been different had the arguments been made.
In all candor, prior to the evidentiary hearing, the court was very concerned with the failure to present any mitigation evidence, other than the stipulation. At first glance, it appears that the decision not to put on evidence constituted per se ineffectiveness. Once the court heard the testimony of the trial attorneys and could begin to understand the legal strategy, the initial presumption of ineffectiveness was overcome by evidence of sound legal tactics and competent counsel. As to all of the arguments concerning the penalty phase proceedings, the court finds that "there is no reasonable probability that the sentence would have been different even if what was presented to this court had been presented during the penalty phase of the defendant's trial." Stewart v. State, 481 So.2d 1210, 1212 (Fla.1985). Collateral counsel argued that trial counsel *437 must have been ineffective at the penalty phase, because even with minimal mitigation evidence, the jury returned a 9 to 3 recommendation. However, after hearing what mitigation was available and the reasons for not introducing a majority of the evidence, the court believes that the jury returned a 9 to 3 vote, not in spite of, but because of, the strategy of trial counsel.
Applying the Stephens standard of review, set forth above, to the circuit court's ruling on this claim, we conclude that the court's factual findings are supported by competent substantial evidence in the record, and the court properly concludedbased on those findingsthat counsel was not ineffective under the Sixth Amendment. We find no error. We reject the remaining claims raised by Trepal pursuant to his first and second rule 3.850 motions.[16] We also reject Trepal's habeas claims.[17]

VII. CONCLUSION
Based on the foregoing, we affirm the circuit court's orders denying relief on Trepal's first and second rule 3.850 motions. We also deny his petition for a writ of habeas corpus.
It is so ordered.
ANSTEAD, C.J., LEWIS, J., and HARDING, Senior Justice, concur.
PARIENTE, J., concurs specially with an opinion, in which ANSTEAD, C.J., concurs.
WELLS and QUINCE, JJ., recused.
PARIENTE, J., specially concurring.
I concur in the denial of postconviction relief in this case. I write only to clarify the difference between the legal standards for establishing prejudice for (a) claims based on newly discovered evidence; (b) claims of ineffective assistance of counsel based on Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), or claims of government suppression of evidence based on Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); and (c) claims of presentation of false testimony based on Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).
*438 The test of prejudice for newly discovered evidence is the most difficult for a defendant to meet, followed by the tests for undisclosed evidence under Brady and ineffective assistance of counsel under Strickland, and, finally, by the test for presentation of false testimony under Giglio. Newly discovered evidence warrants a new trial only if the evidence would probably produce a different resulteither an acquittal or, in capital proceedings, a life sentence. See Jones v. State, 709 So.2d 512, 521 (Fla.1998); Jones v. State, 591 So.2d 911, 915 (Fla.1991). In contrast, the question in evaluating the prejudice prong of an ineffective assistance claim is whether, but for counsel's ineffective performance, there is a reasonable probability of a different result, i.e., a probability sufficient to undermine confidence in the outcome. See Strickland, 466 U.S. at 694, 104 S.Ct. 2052; Rutherford v. State, 727 So.2d 216, 219-20 (Fla.1998); see also Robinson v. State, 770 So.2d 1167, 1172 (Fla.2000) (Anstead, J., specially concurring).[18] The same test for prejudice or materiality applies to Brady claims: whether, had the evidence been disclosed before trial, there is a reasonable probability of a different result expressed as a probability sufficient to undermine confidence in the outcome in the proceedings. See Cardona v. State, 826 So.2d 968, 973 (Fla.2002).[19]
In contrast to the Strickland and Brady tests for prejudice, the proper inquiry in a Giglio claim is whether there is a reasonable likelihood that the false testimony may or could have affected the judgment of the jury. See Giglio, 405 U.S. at 154, 92 S.Ct. 763. As we stated in Routly v. State, 590 So.2d 397, 400 (Fla.1991), relying expressly on Giglio, "[i]f there is a reasonable probability that the false evidence may have affected the judgment of the jury, a new trial is required." More recently, in Ventura v. State, 794 So.2d 553, 563 (Fla.2001), we reaffirmed our statement in Routly and held that in denying a Giglio claim, the trial court "incorrectly relied on the materiality standard appropriate to Brady claims." In explaining the differences between the Brady and Giglio *439 standards, we cited to United States v. Alzate, 47 F.3d 1103 (11th Cir.1995). In Alzate, the Eleventh Circuit stated:
Because of the undisputed facts and the government's concessions in light of those facts, this case comes down to the matter of materiality. Where there has been a suppression of favorable evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the nondisclosed evidence is material: "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). A different and more defense-friendly standard of materiality applies where the prosecutor knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony. Where either of those events has happened, the falsehood is deemed to be material "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976) (emphasis added); accord Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); Napue v. Illinois, 360 U.S. 264, 271, 79 S.Ct. 1173, 1178, 3 L.Ed.2d 1217 (1959). As the Supreme Court has held, this standard of materiality is equivalent to the Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), "harmless beyond a reasonable doubt" standard. Bagley, 473 U.S. at 679 n. 9, 105 S.Ct. at 3382 n. 9.
Id. at 1109-10 (emphasis supplied). The court also noted that the reasonable probability standard of Brady "is substantially more difficult for a defendant to meet than the `could have affected' standard we apply [to a Giglio claim]." Id. at 1110 n. 7.
The legal standard for a court to utilize in evaluating the effect of errors on the reliability of the outcome of criminal proceedings differs depending on the nature of the legal claim asserted. Thus, the standard by which the effect of an error is evaluated is not common to all of Trepal's claims, nor is the materiality prong of Giglio the same as Brady, as the trial court stated in its order.[20]See majority op. at 425-426.
Despite the incorrect statements of law in the trial court order, I agree with the affirmance of the denial of relief on the Giglio claim as well as the disposition of the other claims. Assuming that Martz's false testimony meets the other prongs of Giglio (e.g., that his false testimony is imputed to the State), I conclude that Martz's improprieties in this case could not have led the jury to find other than that Trepal intentionally poisoned his neighbors with thallium, resulting in the death of Peggy Carr. Accordingly, I concur in the affirmance of the order denying postconviction relief as well as the denial of the petition for a writ of habeas corpus.
ANSTEAD, C.J., concurs.
NOTES
[1] The trial court found that the following aggravating circumstances had been established:

The judge found three statutory aggravating factors: previously convicted of another capital felony or of a felony involving the use or threat of violence (the contemporaneous attempted-murder convictions); great risk of death to many persons (introducing poisoned Coca-Cola into the multiple-children Carr household); and committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (carefully removing the cola bottle caps, dissolving the poison in solution, adding the solution to the bottles, carefully replacing the caps, and then secreting the cola into the Carr household).
Trepal, 621 So.2d at 1363 (footnote omitted).
[2] The trial court found that the following statutory mitigating circumstance had been established:

[The judge] found one statutory mitigating factor (no significant history of prior criminal activityonly one conviction for illegal manufacture of amphetamines)....
Id. (footnote omitted).
[3] The trial court found that the following nonstatutory mitigating circumstances had been established:

[The judge] found ... several nonstatutory mitigating factors (happy childhood and marriage; high intelligence; above-average adjustment to prison life; and kind and generous).
Id.
[4] This Court summarized the issues that Trepal raised on direct appeal as follows:

Trepal raises seven issues on appeal: 1) the evidence was insufficient to support the conviction for first-degree murder; 2) the bottle of poison found in Trepal's garage should have been suppressed; 3) evidence linking Trepal to the crime was erroneously admitted; 4) Trepal did not "cause" Peggy Carr's death, rather the treating physician did (raised for the first time on appeal); 5) counsel's waiver of jury instruction on maximum and minimum penalties rendered him ineffective; 6) failure to give an instruction on circumstantial evidence was an abuse of discretion; and 7) the death penalty is improper.
Id. (footnote omitted).
[5] In the interim, Trepal filed an interlocutory appeal regarding the disclosure of public records. See Trepal v. State, 704 So.2d 498 (Fla. 1997).
[6] Because of the extraordinarily convoluted manner in which Trepal's claims were presented, the circuit court in its order denying relief simply summarized the claims:

The defendant was inadequately represented by three attorneys who had little to no criminal law experience. The case was primarily handled by the youngest and least experienced of the attorneys. The attorneys failed to present the jury with evidence of other suspects or of a possible separate poisoning attempt through the use of arsenic. The state committed a Brady violation by failing to disclose a handwritten note from Peggy Carr, the victim of the homicide, to her husband, Pye Carr. The note would have assisted defense counsel in "pointing the finger" at Pye Carr as the suspect. Law enforcement's obsession with potential book and movie deals caused them to conduct a ruthless investigation of the defendant, ignoring other suspects and Mr. Trepal's constitutional rights. The Polk County Sheriff's Office conducted an intrusive undercover investigation of Mr. Trepal for nearly a year in an attempt to incriminate an innocent man. The investigation was progressing very slowly when law enforcement conveniently located a bottle containing thallium (the poison used to kill Peggy Carr) in the defendant's abandoned garage.
After defense counsel's ineffective representation of the defendant, and the aforementioned actions of the state and law enforcement resulted in a first degree murder conviction, counsel performed inadequately at the penalty phase as well. Despite knowing that they could introduce evidence that the defendant was intellectually gifted, had a difficult childhood due to a speech impediment, and had numerous friends from MENSA who would testify that the defendant was nice, friendly and non-violent, defense counsel failed to present any evidence in mitigation. The combination of ineffective assistance of counsel during all phases of the trial, the state's Brady violation, and the actions of law enforcement led to an unwarranted conviction and the subsequent sentence of death.
[7] See Office of the Inspector General, U.S. Dep't of Justice, The FBI Laboratory: An Investigation into Laboratory Practices and Alleged Misconduct in Explosive-Related and Other Cases (1997).
[8] The circuit court in its order denying relief summarized Trepal's claims as follows:

The claims are as follows: (1) newly discovered evidence shows that the prosecution relied on unsound scientific evidence; (2) counsel were ineffective because they failed to discover the new evidence; (3) the cumulative effect of errors warrants a new trial; (4) Martz mislabeled charts; (5) Q1 produced thallium III on an MS test; (6) he failed to test unadulterated Coke with thallium nitrate; (7) he failed to run blanks; (8) he could not explain results which indicated the presence of sulfate and chloride on the MS test; (9) his conclusion that Q206 contained pure thallium I nitrate was not supported by his testing method or test results; (10) the wire technique used to ionize certain ions was an unproven testing method; (11) XRD results indicated the presence of thallium chloride with no indication of thallium nitrate; (12) Martz failed to verify the conditions under which he differentiated between nitrate, chlorate, and phosphate; (13) his notes indicate that trace amounts of nitrate were detected in unadulterated Coke, but he testified to the contrary; (14) Martz incorrectly labeled the silver nitrate test results; (15) his lab notes contain insufficient detail; (16) Martz testified that Q1-3 contained nitrate while his report states that Q1, Q2 and Q3 are "consistent with the presence" of nitrate; (17) he testified falsely that he performed two tests on Q1, Q2 and Q3, and two tests on Q206; (18) he failed to perform IC on Q3 but testified that he had; (19) newly discovered evidence of bottle cap expert testimony shows Havekost testified falsely; (20) Martz's opinion that thallium nitrate was added is scientifically unfounded and therefore false; and (21) Martz testified falsely that the DP test tests for nitrates.
[9] The hearing was held in February and July 1999, having been stayed during an interlocutory appeal. See Trepal v. State, 754 So.2d 702 (Fla.2000).
[10] In his present rule 3.850 appeal, Trepal raises the following claims: (1) "no guilt phase adversarial testing"; (2) "law enforcement conflict of interest"; (3) "juror misconduct"; (4) "attorney conflict of interest"; (5) "no penalty phase adversarial testing"; and (6) "public records."
[11] In his petition for a writ of habeas corpus, Trepal raises the following claims: (1) "the state was erroneously allowed to introduce testimony based solely on hearsay to establish a link between Mr. Trepal and the brown bottle, and this Court erred in failing to address this issue on direct appeal, or appellate counsel provided ineffective assistance in failing to raise it properly;" and (2) "appellate counsel failed to raise on appeal numerous meritorious issues which warrant reversal of either or both the convictions and sentences."
[12] See generally Strickland v. Washington, 466 U.S. 668, 697, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (" If it is easier to dispose of a ... claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").
[13] Trepal also alleges that lack of a toxicology expert rendered defense counsel deficient in failing to investigate evidence that Travis Carr's thallium levels increased during his hospital stay.
[14] See Strickland, 466 U.S. at 698, 104 S.Ct. 2052.
[15] This subclaim also embraces the following points: (1) the State withheld (a) a letter that had been written from Peggy Carr to her husband, and (b) intelligence reports written by Detective Goreck; and (2) trial counsel was ineffective in failing to investigate (a) Trepal's speech impediment, and (b) the fact that other people were aware of the threatening note that the Carr family had received prior to the poisonings.
[16] Specifically, we reject as without merit the following claims: claim (1)(A)(1) ("Frye issue"); claim (1)(B)(2) ("Thallium Increase in Hospital"); claim 1(C)(1) ("Brady issues"); claim (1)(C)(3) ("Speech impediment"); claim (1)(C)(4) ("The threatening note"); claim (2) ("Law Enforcement's Conflict of Interest"); claim (3) ("Juror Misconduct"); claim (4) ("Attorney Conflict of Interest"); claim (6)(A) ("Records of Confidential Informant"); claim (6)(B) ("Exempt Records of State Attorney's Office"); claim (6)(C) ("Interviews Related to Susan Goreck's Book"). We reject any other claim or subclaim raised by Trepal pursuant to his first and second rule 3.850 motions.
[17] Specifically, we reject the following subclaims under claim (1):(a) the trial court erred in allowing the State to introduce hearsay testimony to establish a link between Trepal and the brown bottle found in his garage (procedurally barred); (b) this Court erred in failing to address the hearsay claim on direct appeal (no merit); and alternatively (c) appellate counsel was ineffective in failing to raise the hearsay claim properly (no merit). We also reject as without merit claim (2), wherein Trepal asserts that appellate counsel was ineffective in the following ways: (a) in failing to raise on appeal the State's repeated presentation of inadmissible, irrelevant, inflammatory and unfairly prejudicial evidence; (b) in failing to raise on appeal the improper limitations on the defense cross-examination of State witnesses; and (c) in failing to raise on appeal the improper jury instructions on aggravating circumstances. We reject any other claim or subclaim raised by Trepal pursuant to his habeas petition.
[18] In rejecting the use of the standard for newly discovered evidence, the Supreme Court in Strickland explained:

Even when the specified attorney error results in the omission of certain evidence, the newly discovered evidence standard is not an apt source from which to draw a prejudice standard for ineffectiveness claims. The high standard for newly discovered evidence claims presupposes that all the essential elements of a presumptively accurate and fair proceeding were present in the proceeding whose result is challenged. An ineffective assistance claim asserts the absence of one of the crucial assurances that the result of the proceeding is reliable, so finality concerns are somewhat weaker and the appropriate standard of prejudice should be somewhat lower. The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.
Strickland, 466 U.S. at 694, 104 S.Ct. 2052 (citation omitted) (emphasis supplied).
[19] After expressly rejecting the test for newly discovered evidence, in enunciating the prejudice prong of the test the Strickland court explained:

Accordingly, the appropriate test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution, and in the test for materiality of testimony made unavailable to the defense by Government deportation of a witness. The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.
466 U.S. at 694, 104 S.Ct. 2052 (citations omitted).
[20] It is understandable that the trial court was misled as to the correct legal standard by our statement in Rose v. State, 774 So.2d 629, 635 (Fla.2000), that the materiality standard under Giglio was the same as under Brady. We should take this opportunity to clarify the misstatement in Rose.